IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FREEDOM CAPITAL GROUP LLC,    )
    )
    Plaintiff,    )
    )    NO. 3:24-cv-00369
v.    )    JUDGE RICHARDSON
    )
BLUE METRIC GROUP, LLC, et al.,    )
    )
    Defendants.    )

## MEMORANDUM OPINION

Pending before the Court is Plaintiff's motion for a preliminary injunction (Doc. No. 11, "Motion").[1] Defendants Blue Metric Group, LLC, Blue Metric RV Park Fund, LLC, and Bayberry RV Park, LLC (collectively, "Blue Metric"), Defendants John Cascarano and John Cascarano, PLLC (collectively "Cascarano"), and Defendant Chris Haynes ("Haynes") (collectively, with Blue Metric and Cascarano, "Defendants") filed a response in opposition to the Motion (Doc. No. 30, "Response"), to which Plaintiff filed a reply (Doc. No. 35, "Reply").

With their Response, Defendants filed declarations of Cascarano[2] and Haynes with supporting documents attached thereto. (Doc. Nos. 31, 32). Plaintiff then filed the declaration of

---

[1] Included in the Motion is a memorandum of law in support of the motion. The Court must admonish counsel that this approach—not making the supporting memorandum of law a separately filed document— runs contrary to this Court's Local Rule 7.01(a)(2) and should be avoided in the future lest the Court ultimately reject the filing (which, this time at least, the Court will not do). Both the Motion and the memorandum included therein are referred to herein as "Motion."

[2] With leave from the Court, Cascarano filed a second declaration (Doc. No. 42, "Cascarano's Second Declaration") in response to a single issue raised by Plaintiff for the first time in its Reply. Plaintiff then filed (with leave from the Court) a sur-reply in support of the Motion (Doc. No. 46) to address Cascarano's Second Declaration.

Cameron Bailey ("Bailey"), co-founder and Chief Investment Officer of Plaintiff, with supporting documents attached thereto. (Doc. No. 36).

For the reasons stated herein, the Motion will be denied.

BACKGROUND

**I.**   **Factual Background[3]**

A. *Plaintiff's Business and Alleged Trade Secrets*

Plaintiff is a business, founded by Kevin Barnett ("Barnett") and Cameron Bailey ("Bailey"), that identifies, acquires, and manages RV parks. (Doc. No. 1 at ¶¶ 2, 20). Plaintiff identifies off-market RV Parks and gathers information about those parks such as the RV parks' owners' contact information, the owners' initial asking prices and deal terms, and park-specific factors such as proximity to tourism hubs or popular destinations, anticipated renovation costs, operating expenses, net operating income, and guest facilities and amenities. (*Id*. at ¶ 31). Plaintiff obtains this information from a number of sources, including "public records, site visits, negotiations with RV Park owners, and (beginning in late 2022) its internal call center, which used automated and manual contact features, such as SMS text messaging, voicemail drops, and direct calls from [Plaintiff's] representatives." (*Id*. at ¶ 32). Plaintiff consolidates all such information into its customer relationship management system ("CRM") and synthesizes the data to calculate the projected value to be gained by adding each respective park to its portfolio. (*Id*.). By compiling this information (a process that Plaintiff started in October 2020), Plaintiff has built a "Contact List" of over 34,000 parks. (*Id*. at ¶ 36). Plaintiff then sends Acquisition Team members (such as

---

[3] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

Haynes), who (at least in the case of Haynes) are independent contractors,[4] to gather information about and evaluate potential targets, and to engage with owners. (*Id*. at ¶¶ 33–35). Acquisition Team members are expected to add to Plaintiff's CRM the information they gather—such as proximity to Plaintiff's other properties, existing guest accommodations and facilities, anticipated refurbishment and renovation costs, operating overhead, and operating income and revenues. (*Id*. at ¶ 34).

Notably, Plaintiff represents that Acquisition Team members have unfettered access to the CRM, provided that they access it with their username and password and utilize the two-step authentication process. (Doc. No. 11-1 at 6, n.4).[5] Plaintiff has, in addition to the Acquisition Team, Call Center representatives who contact potentially interested sellers via a third-party telephone platform called "Just Call."[6] (Doc. No. 1 at ¶¶ 37, 39). Information from the calls (including audio recordings and various data points) is also added to the CRM. (*Id*. at ¶ 39).

Based on an analysis of all of the information in the CRM, Plaintiff created and maintains an "Investment Book," which is a catalog of investment-grade properties. (*Id*. at ¶ 41). Plaintiff grades and ranks the properties in its Investment Book in accordance with Plaintiff's own investment criteria and designates each property in the Investment Book as one of the following,

---

[4] Initially, Plaintiff characterized Acquisition Team members as "employees" (Doc. No. 1 at ¶ 18; 11 at 2). But in its Reply, Plaintiff acknowledges that at least with respect to the Acquisition Team member most relevant to this case, Haynes, "[his] relationship with [Plaintiff] is likely best described as an independent contractor." (Doc. No. 35 at 2).

[5] Plaintiff apparently makes this representation in an effort to show the wrongfulness of Haynes's conduct— to show essentially that Haynes shamelessly took advantage of the good-faith largesse of Plaintiff with respect to its information. However, as discussed below, this representation substantially undercuts Plaintiff's assertion that (as required to show information's trade-secret status) it took reasonable measures to protect its alleged trade secrets.

[6] JustCall records the Call Center representatives' voicemails and conversations with potential sellers and logged the RV parks owners' name, contact information, and whether the owner was interested in a sale. (Doc. No. 1 at ¶ 39).

ranging from most to least attractive: "Hot" "Backburner," "Prospect Pipeline" or "Dead." (*Id*. at ¶ 42). Plaintiff claims that the Investment Book and all of the information stored in the CRM and JustCall account (such as the Contact List and "Hot List" (which, unsurprisingly, is a list of all properties designated as "Hot") constitute trade secrets. (Doc. No. 11-1 at 11). In support of this, Plaintiff asserts that it invested significant time and expenditure into collecting and compiling this information, and that the information provides Plaintiff with independent economic value by enabling Plaintiff to stay ahead of competitors in expanding its portfolio. (Doc. No. 1 at ¶ 121). Plaintiff claims it took reasonable measures to keep confidential the information contained in these sources by requiring usernames and passwords and two-factor authentication to access it, and by training each representative to keep information contained in these sources confidential—although Plaintiff offers no documentation showing that it actually trained its representatives to keep this information confidential. (*Id*. at ¶ 122).

B. *Defendants' Alleged Misappropriation*

Haynes worked as an independent contractor for Plaintiff from June 2022 until April 2023, when Haynes voluntarily terminated his working relationship with Plaintiff. (Doc. No. 1 at ¶¶ 54, 69). As a member of Plaintiff's Acquisition Team, Haynes was tasked with evaluating certain potential target properties and gathering information relevant to the potential acquisition of those properties. (*Id*. at ¶ 33).

Cascarano worked as outside counsel for Plaintiff beginning some time in 2022 and ending in the spring of 2023.[7] (*Id*. at ¶ 60; Doc. No. 31 at ¶ 27). In this role, Cascarano assisted Plaintiff in the acquisition of several RV Parks.[8] (Doc. No. 31 at ¶ 28).

In the fourth quarter of 2022, Cascarano expressed to Plaintiff his interest in forming his own RV park acquisition and management firm. (Doc. No. 1 at ¶ 55). Plaintiff did not oppose Cascarano's plan to form a company similar to Plaintiff, and in November 2022, (while still representing Plaintiff in at least some fashion), Cascarano formed Blue Metric Group—a company that, like Plaintiff, purchases and manages RV parks. (*Id*. at ¶¶ 55–56). According to Plaintiff, Cascarano represented to Bailey that Blue Metric Group would be a "collaborative, non-competitive enterprise" created to procure and manage RV parks that Plaintiff agreed to transfer to Blue Metric Group in exchange for an assignment fee.[9] (*Id*.). To that end, between November 2022 and April 2023, Blue Metric Group acquired four RV parks that Plaintiff had identified but had not acquired, and paid Plaintiff an acquisition fee for each transaction. (*Id*. at ¶ 57). Because of the alleged understanding that Blue Metric Group would not compete with Plaintiff, Haynes

---

[7] Plaintiff does not specify the precise time at which Cascarano began representing it. Cascarano, for his part, asserts that he signed his engagement letter with Plaintiff on December 22, 2022, months after Plaintiff assigned any purchase agreements to Blue Metric, as discussed below.

[8] The parties dispute the extent of Cascarano's legal representation of Plaintiff. Cascarano insists that he had a minor role limited to assisting Plaintiff with its form purchase agreement and preparing a "handful of purchase agreements upon request, typically after [Plaintiff] had already struck a deal with a seller." (Doc. No. 31 at ¶ 28). Cascarano denies both that he had any involvement in Plaintiff's discussions regarding which properties to target and that he had access to (or in fact accessed) the CRM, JustCall account, Hot List, Investment Book, or any other allegedly proprietary information. (*Id*. at ¶¶ 28-30). Plaintiff, on the other hand, maintains that Cascarano served as a "principal negotiator for several of [Plaintiff's] RV Park acquisitions," and gained "insider knowledge" of Plaintiff's "pricing and pro forma business plans" in the process. (Doc. No. 1 at ¶ 51).

[9] This arrangement, whereby one company or person assigns to another—in exchange for an "assignment" or "wholesale" fee—the right to purchase an RV park it identified, is referred to in the industry as "wholesaling."

and Cascarano continued working with Plaintiff through the spring of 2023, despite Cascarano having formed Blue Metric Group several months earlier. (*Id*. at ¶ 60).

Plaintiff alleges that in early 2023 (while Haynes was still a member of Plaintiff's Acquisition Team and Cascarano was still representing Plaintiff in at least some legal capacity), Defendants "accessed, downloaded or transferred, and destroyed or attempted to destroy confidential and proprietary information derived from the Contact List, JustCall account, CRM, and Investment Book." (*Id*. at ¶ 75). Defendants allegedly did so through Haynes's access to the CRM and an unidentified Call Center representative's access[10] to the JustCall account. (*Id*.). Plaintiff further alleges that Blue Metric used and continues to use this "stolen" information to appropriate RV park investment opportunities from Plaintiff, including at least seven RV parks listed in the Investment Book.[11] (*Id*. at ¶¶ 75-76).

## II.    Procedural History

Plaintiff initiated this action on April 1, 2024, by filing a verified complaint (Doc. No. 1, "Verified Complaint") which remains the operative complaint in this case. Via the Verified Complaint, Plaintiff asserts several causes of action including: misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. 1831, *et seq*. ("DTSA") (Count I) and the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq*. ("TUTSA") (Count

---

[10] Plaintiff asserts that Defendants induced unidentified Call Center representatives to provide Defendants with information from the JustCall account and to contact RV park owners on behalf of Defendants, using the Plaintiff's Call Center. (Doc. No. 1 at ¶¶ 82-85). While it is true, according to the transcription of a call recording submitted by Plaintiff (Doc. No. 36-8), that at least one Call Center representative called RV park owners purportedly on behalf of Defendants, Plaintiff has not yet offered evidence showing that (or how) Defendants "induced" Plaintiff's Call Center representative to do this or that Defendants used the information allegedly obtained from any Call Center representative in the purchase of any RV park.

[11] Additionally, Plaintiff asserts that Defendants directed the Call Center representative(s) to delete nearly all information from Plaintiff's JustCall account (including data about calls made and the entire Contact List) so that Plaintiff can no longer access that information. (Doc. No. 1 at ¶¶ 86, 88-89).

II), unfair competition (Count III), tortious interference with contracts for several RV parks (Counts IV - VI), tortious interference with business relationships and prospective economic advantage (Count VII), breach of fiduciary duty (Count VIII), aiding and abetting breach of fiduciary duty (Count IX) against Blue Metric Fund and Blue Metric Group, civil conspiracy (Count X), constructive trust (Count XI).[12] Plaintiff seeks compensatory and punitive damages in addition to preliminary and permanent injunctive relief and a constructive trust.

With respect to preliminary injunctive relief, Plaintiff requests that the Court issue an order enjoining Defendants from (i) completing any pending transactions in which they utilized, directly or indirectly, any information Plaintiff stored in its CRM or JustCall accounts, and (ii) prohibiting Plaintiff from accessing the information within its CRM and JustCall accounts. (Doc. No. 11 at 3-4).

<u>LEGAL STANDARD</u>[13]

Those seeking a preliminary injunction must meet four requirements.[14] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def.*

---

[12] Counts IV–VI and VIII are brought against Cascarano only; Count IX is brought against Blue Metric Group and Blue Metric Fund only; and all remaining Counts are brought against all defendants.

[13] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

[14] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are *factors* rather than *requirements,* except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a preliminary injunction alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g.*, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with more recent Sixth Circuit case law and with Supreme Court case law (including the two cases cited above) describing these as all being requirements. The Court believes that it should follow the latter line of cases.

*Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.*, 368 F. Supp. 3d 723, 725 (S.D. N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials that would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d

597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

ANALYSIS

**I.    Likelihood of Success on the Merits**[15]

Plaintiff bases the Motion only on its claims for misappropriation of trade secrets under both the DTSA and TUTSA (Counts I and II).[16] "The respective requirements for establishing misappropriation under these statutes are largely the same, and so the Court will conduct a single analysis." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *11 (M.D. Tenn. Apr. 28, 2021) (citing *Great Am. Opportunities, Inc. v. Cherry Bros.*, LLC, No. 3:17-CV-1022, 2018 WL 418567, at *3 (collecting cases)); *Allergan, Inc. v. Revance Therapeutics, Inc.*, No. 3:23-CV-00431, 2024 WL 38289 (M.D. Tenn. Jan. 3, 2024). To succeed on a trade secrets misappropriation claim, a plaintiff must show "(1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (citation omitted); *see also* 18 U.S.C. § 1839.

---

[15] In this section, the Court states various facts in an unqualified manner, for ease of reading. But to be clear, these statements are based on the current state of the record, are subject to change, and do not reflect the Court's final conclusion as to the applicable facts. Instead, they represent only the Court's view, based solely on the current record, of facts that are *likely* to be established.

[16] In the Motion, Plaintiff states that it is likely to succeed on "at least some of its claims"—namely, its misappropriation claims (Counts I and II). (*See* Doc. No. 11-1 at 10). Plaintiff makes no argument as to why it is likely to succeed on any of its other claims. The Motion's exclusive focus on the misappropriation claims is also consistent with the Verified Complaint, wherein Plaintiff specifically requests (in addition to damages) preliminary injunctive relief in the sections identifying Plaintiff's first and second causes of action, (*see* Doc. No. 1 at ¶¶ 131, 147), but requests only damages in the sections describing the remaining Counts.

Given that the Motion is based solely on Counts I and II, the Court need assess Plaintiff's likelihood of success only on those two claims and takes no position as to Plaintiff's likelihood of success on any other claims.

Plaintiff is unlikely to succeed on its misappropriation claims because it is unlikely to be able to show the existence of a trade secret. "TUTSA lists three requirements for information to be considered a trade secret: (1) the information must derive independent economic value from not being generally known, (2) others could obtain economic value from its disclosure or use, and (3) efforts have been made to maintain its secrecy." *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-CV-2847-JPM-CGC, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010) (citing Tenn. Code Ann. § 47-25-1702(4)); *see also Williams-Sonoma Direct, Inc., v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1017 (W.D. Tenn. 2015) (quoting *J.T. Shannon Lumber*, 2010 WL 3069818, at *4).[17]

---

[17] As this Court has previously explained:

[S]ome factors [are] relevant to whether information is a trade secret under Tennessee law:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and to its competitors;

(5) the amount of money or effort expended by the business in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others[.]

*Great Am. Opportunities, Inc.*, 2018 WL 418567, at *4 (quoting *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)). These six factors originated in cases discussing the common law misappropriation of trade secrets. *E.g., Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001). However, they have still been found relevant by courts (including this Court) to the analysis of whether information is a trade secret under TUTSA. *E.g., SDC Fin., LLC v. Bremer*, No. 3:19-CV-00525, 2019 WL 4393543, at *4 (M.D. Tenn. Sept. 13, 2019); *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006), aff'd, 246 F. App'x 969 (6th Cir. 2007); *ProductiveMD*, 821 F. Supp. 2d at 961. However, cases noting the distinction between TUTSA and the common law have not applied the factors (also without comment). *Williams-Sonoma Direct, Inc.*, 109 F. Supp. 3d at 1018; *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at *4.

Therefore, the Court believes the appropriate analysis is to assess the three requirements prescribed by TUTSA, as enumerated in *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at

Notably, the mere existence of *some* efforts to maintain secrecy is not enough; instead, the efforts on the whole must be *reasonable* (and not just minimal) because "by definition, a trade secret requires reasonable efforts to maintain secrecy." *ProductiveMD, LLC*, 821 F. Supp. 2d at 962 (citing Tenn. Code Ann. § 47–25–1702(4)(B)).[18] Defendants challenge Plaintiff's ability to establish the first element (the existence of a trade secret) and third requirement (that reasonable efforts have been made to maintain the secrecy of the information).

    A. *It is likely that, of the information allegedly comprising trade secrets, only information in the Investment Book derives independent economic value from not being generally known.*

As noted above, Plaintiff claims that Defendants stole confidential information from its CRM, JustCall account, and Investment Book. Plaintiff admits that "some (if not all)" of the

---

    *4. However, the concepts and considerations reflected in the six factors certainly appear to be variously relevant to the analysis of the three requirements. Though weighing the six factors is not the appropriate test for Plaintiff's TUTSA claim, the six factors are not wholly irrelevant to the Court's analysis herein.

*PSC Indus.*, 2021 WL 1663574, at *12 n.20 (M.D. Tenn. Apr. 28, 2021).

[18] As the Tennessee Court of Appeals has accurately explained:

    The term "trade secret" has a statutory definition [under the TUTSA] that is similar to the common law definition:

        [I]nformation, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

        (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

        (B) Is the subject of *efforts that are reasonable under the circumstances* to maintain its secrecy.

    T.C.A. § 47–25–1702(4) (2001).

*Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008–00936–COA–R3–CV, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan. 28, 2010) (emphasis added).

information contained in each of those sources could be obtained through publicly available information.[19] (Doc. No. 11-1 at 12). Thus, that information would not be entitled to trade secret protection. Nevertheless, Plaintiff argues that the *compilation* of this information in each source (e.g., the Investment Book, CRM, and JustCall account) constitutes a trade secret because of its value to Plaintiff and the effort in time and expense Plaintiff went to procure, compile, and "synthesize" it. In essence, Plaintiff's argument is that while the particular information in the CRM, JustCall account, and Investment Book (for example, the name of any particular RV park) is not necessarily a trade secret (because that information is publicly available), the *compilation* of information regarding thousands of RV parks, including contact information and other details of each park, is a trade secret (because it is valuable to Plaintiff based on the significant resources and effort Plaintiff has expended to compile such information).

Plaintiff relies on two cases to support its argument, but both of them are distinguishable, at least with respect to the CRM and JustCall account. First, Plaintiff points to the Sixth Circuit's statement in *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022), that "'a plaintiff may prevail in a trade-secrets case without identifying a specific item of information that is not publicly known or readily available.'" (quoting *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411 (6th Cir. 2006), *abrogated on other grounds as recognized by A.K. ex rel. Kocher v. Durham Sch. Servs., L.P.*, 969 F.3d 625, 629–30 (6th Cir. 2020)). Although it is true that *Caudill* contemplated that the combination or compilation of discrete (individual) items of information known throughout an industry could conceivably constitute a trade secret, the court in *Caudill* made clear that "the plaintiff [seeking to protect a purported trade secret] must

---

[19] At least with respect to the information contained in the CRM and JustCall account, Plaintiff has not shown that any of it is in fact not publicly available. Accordingly, Plaintiff's qualification that "[perhaps] not all" of the information could be obtained through publicly available information is a nullity and will be treated as such by the Court.

establish the combination of known elements or components is unique" (even if no individual item in the combination is unique). *Id*. (internal quotation omitted). Plaintiff asserts that the information contained in the CRM and JustCall account constitute trade secrets "because [Plaintiff] not only collected and compiled data, it synthesized that data and ranked potential RV Park acquisitions based on investment criteria." (Doc. No. 11-1 at 12). Presumably, Plaintiff would argue that its synthesis of the data in the CRM and JustCall account and ranking of potential RV park acquisitions based on investment criteria is what makes its compilation of data "unique," and the Court would agree with that position. But it appears that only the information in the *Investment Book*—and not the information in the CRM or JustCall account—has actually undergone this analytical process. Although Plaintiff alleges in the Verified Complaint that Plaintiff developed the CRM platform "to store, synthesize, and analyze off-market RV Park data it obtained from a number of sources," Plaintiff never explains how (or in what sense) the information is "synthesize[d]" or "analyze[d]," except by stating that Plaintiff used the information "collected" and "stored" in the CRM to "calculate every RV Park's projected value-add to [Plaintiff's] portfolio, based on a park's physical and economic attributes and as compared to comparable parks in the CRM database." (*Id*. at ¶¶ 32-33) (emphasis added). As far as the Court can tell, information about the "projected value-add" calculated from the data "collected" and "stored" in the CRM is not itself included in the CRM or JustCall account; rather, that information is contained only in the Investment Book. The Verified Complaint states:

> [Plaintiff] applied the CRM's analytics tools and its own, customized and proprietary valuation methodologies to assemble select property lists that were prioritized based on, without limitation, the RV Park owners' interest in a sale, the economic and physical attributes of each property, [Plaintiff's] valuations, and other data-based conclusions and performance indicators the company discerned from the property information database. By engaging in this expansive analytical process, [Plaintiff] produced a catalog of investment-grade properties that, almost

invariably, are unlisted and completely undiscovered within the real estate investing sector (the "Investment Book").

(*Id*. at ¶ 41). Based on this description, it appears to the Court that the CRM is merely a depository of publicly available information gathered by Plaintiff (via its Acquisition Team and Call Center); that publicly available information is then analyzed using multiple factors, and the product of that analysis is the Investment Book—a "catalog of investment-grade properties" prioritized according to their ability to meet Plaintiff's specific investment criteria.

So, unlike the CRM and JustCall account—which include only information that is publicly available—the Investment Book is unique because it conveys, in addition to publicly available information, some information that is *not* publicly available—namely, the potential profitability (based on Plaintiff's investment criteria) of each RV park included therein.

In sum, although Plaintiff has not indicated what (if anything) makes the compilation of publicly available information in the CRM and/or JustCall account unique (such that it is potentially protectible as a trade secret under *Caudill*) Plaintiff has shown—through its analysis and ranking of the information therein—that the Investment Book is unique (such that it potentially is protectible as a trade secret).

Second, Plaintiff relies on *GEP Administrative Services, LLC v. Wiseman*, No. 3:24-cv-00256, 2024 WL 1019277, at *13 (M.D. Tenn. Mar. 8, 2024), wherein this Court found the existence of trade secrets in confidential information that "ha[d] high value because it detail[ed] internal proprietary processes and decision making, clients, potential clients, and their contact information, pricing and financial statements, and other sensitive business data[.]" But unlike here, in *GEP* the plaintiff did not acknowledge that "some (if not all)" of the information at issue was publicly available. So at least with respect to the information in the CRM and JustCall account, the Court does not see how Plaintiff could show that information—which Plaintiff admits was

derived mostly (if not entirely) from publicly available information—could derive value *from not being generally known*. Information in the Investment Book, on the other hand, is likely to derive value from not being generally known because that information includes not only publicly available information about various RV parks, but also information that has been analyzed based on Plaintiff's specific investment criteria and ranked based on its potential profitability. As a result of that analysis and ranking, the information in the Investment Book conveys non-public information—the potential profit Plaintiff could gain by adding each RV park to Plaintiff's portfolio. Therefore, the Investment Book—unlike the CRM or JustCall account—conveys more than merely information that is publicly available.

B. *Plaintiff likely has not made reasonable efforts to maintain the secrecy of its alleged trade- secret information.*

Even assuming arguendo that Plaintiff derives value from information in all three sources (the CRM, JustCall account, and Investment Book) *not being generally known*,[20] that information is not likely to be considered trade secrets because Plaintiff likely has not taken reasonable efforts to maintain its secrecy.

Plaintiff argues that it took reasonable measures to protect the information contained in its CRM, JustCall account, and Investment Book from public disclosure by: (i) hosting those sources on its cloud-based servers, (ii) limiting access to its top management and Acquisition Team, (iii) assigning usernames and passwords (which require two-factor identification) to those with access, and (iv) tracking those who log in to the CRM and Investment Book when it backs up its systems. (Doc. No. 11-1 at 13). In asserting that these methods are sufficient to protect the information at

---

[20] The Court concluded immediately above that the information in the Investment Book likely derives value from not being generally known but that information in the CRM and JustCall account does not. Here, the Court assumes arguendo that the information CRM and JustCall account likewise derive value from not being generally known.

issue, Plaintiff relies on an unreported case wherein the Sixth Circuit held that the trial court did not clearly err in finding that documents were protectable trade secrets because the plaintiff password-protected the documents and limited access to employees whose positions required them to view the documents. *RECO Equip., Inc. v. Jeffrey Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021).

Putting aside the fact that this Court is not bound by the holding in *RECO*, Plaintiff ignores an important distinction between *RECO* and this case. In *RECO*, access to the alleged trade secrets was limited to *employees*, whereas here, Plaintiff gave access to (in addition to certain employees) independent contractors who were not bound by *any* agreement—or, for that matter the duty of loyalty owed by an employee to an employer under Tennessee law[21]—whatsoever to maintain confidentiality or even to work exclusively for Plaintiff in their business dealings. Given that Haynes was not an employee and did not sign any type of confidentiality or non-disclosure agreement, it is entirely unclear what exactly Plaintiff believes obligated Haynes to maintain the secrecy of the information that Plaintiff willingly shared with him and every other member of its Acquisition Team. Plaintiff points to Bailey's declaration stating that Plaintiff trained and required all members of its Acquisition team (including Haynes) to "maintain the confidentiality of the RV Park information he procured on behalf of [Plaintiff], the non-public RV Park information stored in the CRM, and to never disseminate, disclose, or otherwise reveal such information to any non-

---

[21] The employee's duty of loyalty arguably could impose a duty of confidentiality upon a former employee under certain circumstances. *See Data Processing Equip. Corp. v. Martin*, No. 87-230-II, 1987 WL 30155, at *4 (Tenn. Ct. App. Dec. 30, 1987) (identifying the issue of whether the defendants there "did not breach their duty of loyalty to the complainant and violate the implied terms of a contract of employment that an employee, who has left his employment, must not use trade secrets or other confidential information which he has acquired during the course of his employment for his own benefit to the detriment of his former employer."*).* But even if this duty does exist, it is not violated if the information acquired by the former employee during his or her employment with the plaintiff was not actually confidential and proprietary. In any event, this duty could not under any circumstances apply to a non-employee like Haynes.

[Plaintiff] personnel" (Doc. No. 36 at ¶ 15), but Plaintiff has not offered any documentation corroborating this assertion.[22] Plaintiff has not pointed to, for example, training materials[23] or a memorandum or an email instructing any Acquisition team member (much less Haynes) to keep information in the CRM, JustCall account, or Investment Book confidential. And given Haynes's sworn declaration wherein he insists that he was never told that any information on those systems was confidential (and/or, was to be kept confidential) (Doc. No. 32 at ¶¶ 15, 20, 23, 49), the Court simply cannot conclude (on the record available at this early stage) that it is in fact likely (even if plausible) that Plaintiff instructed Haynes to keep such information confidential.[24]

In sum, Plaintiff's insistence that "[t]he Investment Book is the most valuable and protected of [Plaintiff's] proprietary and confidential information," (Doc. No. 1 at 12), is belied by its willingness to give independent contractors "unfettered" access to that information—which was

---

[22] As discovery proceeds, it is possible (perhaps even likely) that the Court will examine additional evidence regarding whether and to what extent Plaintiff instructed its independent contractors (including Defendant Haynes) to keep confidential information on the CRM, JustCall account, and/or Investment Book. But at the moment, Plaintiff has not offered evidence sufficient to convince the Court that Plaintiff more likely than not took such measures.

[23] Notably, Plaintiff has submitted dozens of pages of documents used in training Haynes. *See* 36-1, 36-3. But conspicuously absent from those training documents is any content touching on confidentiality.

[24] Even if Plaintiff had merely instructed Haynes to keep such information confidential, it is doubtful that doing so (in the absence of something more, like confidentiality markings and/or a confidentiality agreement with Haynes) would constitute "reasonable" measures to protect Plaintiff's alleged trade secrets, given Haynes's status as an independent contractor.

not even labeled "confidential"—without requiring a non-disclosure or confidentiality agreement[25] or providing any documented training about maintaining the confidentiality of the information.[26]

Because, so far as the record currently indicates, it is at least as likely as not that Plaintiff disclosed its alleged trade secrets to its independent contractors "without notifying them of the information's confidential nature or binding them to confidentiality agreements, [Plaintiff] is unlikely to be able to show that it undertook reasonable measures to protect the secrecy of its alleged trade secrets." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 517-18 (S.D.N.Y. 2017); *see also RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *26–27 (D. Colo. Nov. 13, 2020) (finding that plaintiff-employer did not take reasonable measures to secure information as trade secrets where, despite general practices like password-protected accounts and limiting the number of persons with access to information, the employer failed to advise employees

---

[25] The Court acknowledges that a confidentiality agreement is not per se sufficient to guarantee trade- secret status for the information subject to the confidentiality agreement. Instead, "[w]hether the particular precautions taken by a trade secret holder are reasonable 'depends on a balancing of costs and benefits that will vary from case to case.'" *In re Island Indus., Inc.*, No. 23-5200, 2024 WL 869858, at *3 (6th Cir. Feb. 29, 2024) (quoting *Niemi v. NHK Spring Co.*, 543 F.3d 294, 301 (6th Cir. 2008)). And under the circumstances presented here—namely, where alleged trade-secret information was disclosed to independent contractors who were not likely under any obligation to maintain the secrecy of that information—the lack of a confidentiality agreement (or even instructions to maintain confidentiality) strongly suggests a failure to take reasonable measures to protect the information.

[26] The Sixth Circuit has indicated that whether an alleged defendant received information via a confidential relationship is an inquiry distinct from whether a plaintiff took reasonable measures to maintain secrecy of its alleged trade-secret information. *See Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 428 (6th Cir. 2023). One question in this case is to whether Cascarano violated a fiduciary duty owed to Plaintiff by (according to Plaintiff) acquiring trade-secret information obtained via his legal representation of Plaintiff and later using that information for his own benefit. But that inquiry (i.e., whether Cascarano acquired trade-secret information through his confidential relationship with Plaintiff) is separate from—and has no bearing on the resolution of—whether Plaintiff took reasonable measures to maintain secrecy of its alleged trade-secret information when it disclosed that information to Haynes and other independent contractors without advising them that the information was considered a confidential or having them sign a confidentiality agreement.

Because the Court concludes that it is not likely that Plaintiff reasonable measures to protect the secrecy of its alleged trade-secret information, that information is not entitled to trade-secret protection at all, thus rendering moot (at least for purposes of Plaintiff's misappropriation claims) the separate inquiry of whether Cascarano acquired trade secrets through his confidential relationship with Plaintiff.

that information was considered a trade secret and failed to have the employees sign a confidentiality agreement); *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 891 (E.D. Ky. 2003), *aff'd*, 124 F. App'x 329 (6th Cir. 2005) (applying Kentucky Uniform Trade Secrets Act)[27] ("A failure to require a third party to enter a confidentiality agreement to protect alleged trade secrets is one clear way to waive any trade secret protection that might exist."); *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 884 (N.D. Ill. 2009) (plaintiff's customer list did not receive trade secret protection where plaintiff and its predecessor permitted employees and independent sales representatives to keep the information even after the relationship terminated, did not inform its employees that the customer information was trade secret, and did not require copies of the information be destroyed); *Mortgage Specialists, Inc. v. Davey*, 153 N.H. 764, 768–69, 904 A.2d 652 (2006) (finding that a reasonable jury could have concluded that information was not subject to reasonable efforts to maintain its secrecy, where defendants were independent contractors and neither were asked to sign a nondisclosure or confidentiality agreement nor told that plaintiff's documents or customer information was confidential or constituted trade secrets despite high turnover rate, there was no written policy regarding confidentiality or document destruction and no employee handbook, and defendants had not been told that the customer information belonged to plaintiff or that they were prohibited from copying or maintaining copies of customer information); *Turret Labs USA, Inc. v. CargoSprint LLC*, No. 21-952, 2022 WL 701161, at *3 (2d Cir. Mar. 9, 2022) (affirming dismissal of trade secret claims where the trade secret owner conveyed the software to third parties without executing confidentiality agreements despite other allegations of protective measures); *Farmers Edge Inc. v. Farmobile*, LLC, 970 F.3d

---

[27] Like the TUTSA, "'Kentucky's trade secret protection statute is nearly identical to the DTSA.'" *Caudill*, 53 F.4th at 381, n.2 (quoting *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-cv-379, 2019 WL 1368621, at *14 (E.D. Ky. Mar. 26, 2019)).

1027, 1033 (8th Cir. 2020) (affirming denial of summary judgment to plaintiff where a claimant (to whom plaintiff was the successor-in-interest) disclosed the alleged trade-secret information to third parties without confidentiality agreements or other practices to safeguard the information).

So even assuming arguendo that the information Defendants allegedly acquired and used was valuable to Plaintiff because it is not generally known, Plaintiff is unlikely to succeed in establishing that such information constitutes trade secrets under the DTSA or TUTSA because Plaintiff has not shown (at least based on the current record) that it likely took reasonable measures to protect that information.

   C. *Defendants' actions cannot constitute misappropriation of trade secrets (as opposed to misappropriation of something else) if, as is likely here, the information allegedly misappropriated did not consist of any trade secrets.*

In addition to showing that the information contains protectable trade secrets, Plaintiff must also show a likelihood of success in establishing that Defendants misappropriated those trade secrets. The DTSA defines misappropriation as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who–

   (i)   used improper means to acquire knowledge of the trade secret;

   (ii)  at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was–

       (I)   derived from or through a person who had used improper means to acquire it;

       (II)  acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

       (III) derived from or through a person who owed a duty to the person seeking relief to maintain [its] secrecy or limit [its] use . . . .

18 U.S.C.§ 1839(5); *see also* Tenn. Code Ann. § 47-25-1702(2).

"Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include ... any other lawful means of acquisition." 18 U.S.C. § 1839(6); Tenn. Code Ann. § 47-25-1702(1); *Allergan*, 2024 WL 38289, at *7 ("if a plaintiff shows that a defendant merely acquired (without also using or disclosing) the plaintiff's trade secret(s), then indeed the plaintiff must show that the defendant did so by 'improper means.'").

Because (for reasons explained immediately above) Plaintiff is unlikely to establish that the information in its CRM, JustCall account, and Investment Book are in fact trade secrets, Defendants' alleged acquisition, use, and/or disclosure of that information would not likely constitute misappropriation of trade secrets (even if it could be deemed misappropriation of information that does not have trade-secret status). Accordingly, the Court need not at this time wade through the conflicting factual accounts offered by the parties in support of their respective arguments relating to whether Defendants misappropriated Plaintiff's information. Rather, the Court concludes that because Plaintiff has not established that it took reasonable measures to protect the information contained in its CRM, JustCall account, and Investment Book, Plaintiff is unlikely to succeed on the merits of its claims for misappropriation of trade secrets under the DTSA and TUTSA.

## II. Irreparable Harm

Plaintiff asserts that in the absence of a preliminary injunction, Defendants will continue to misappropriate Plaintiff's trade secrets, causing "further immediate and irreparable harm that money damages cannot remedy." (Doc. No. 11-1 at 16). It is true that some district courts have concluded that irreparable harm is generally established where it is shown that the defendant has

misappropriated the plaintiff's trade secrets." *Deutsche Inv. Mgm't. Americas, Inc. v. Riverpoint Cap. Mgm't. Inc.*, No. 1:02–cv–577, 2002 U.S. Dist. Lexis 16147, at *18 (S.D. Ohio Aug. 22, 2002); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *Broad-Ocean Techs., LLC v. Lei*, No. 21-11297, 2021 WL 2258418, at *2 (E.D. Mich. June 3, 2021). But for the reasons stated above, Plaintiff has not actually shown that Defendants likely misappropriated its trade secrets (because Plaintiff has not shown the existence of any trade secrets). "Because it has not been shown that Defendants misappropriated Plaintiff's trade secrets, irreparable harm cannot be presumed." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008).

With respect to Plaintiff's assertion that an injunction is necessary to keep Defendants from deleting information from the JustCall account, the Court does not see how this can be true in light of Plaintiff's allegation that Defendants have already deleted "virtually all information stored in [Plaintiff's] JustCall account." (Doc. No. 11-1 at 8 (citing Doc. No. 1 at ¶ 86)).[28] Thus, this purported concern is not grounds for finding that Plaintiff will suffer irreparable harm in the absence of a preliminary injunction.

## III.    Balance of Equities

A plaintiff seeking a preliminary injunction must also establish that the balance of equities tips in his favor. *Winter*, 555 U.S. at 20. Seeking to minimize the equities that favor Defendants, Plaintiff asserts that the requested preliminary injunction would not substantially harm Plaintiff

---

[28] Plaintiff might respond that at least some information remains in its JustCall account and could be deleted by Defendants in the absence of injunctive relief. However, the Court would find this concern unreasonable given that Plaintiff has terminated any Call Center representatives allegedly influenced by Defendants. (Doc. No. 11-1 at 8 (citing Doc. No. 1 at ¶ 87)). Moreover, the Court has no reason to believe that Defendants themselves can still access Plaintiff's CRM or Investment Book. Thus, any concern that Defendants might delete the information contained therein is unwarranted and does not indicate a likelihood that Plaintiff could suffer irreparable harm.

because, rather than bar Defendants completely from working in the industry, it would prevent Defendants only from using Plaintiff's confidential information in the course of their (Defendants') business and blocking Plaintiff from accessing its own information. (Doc. No. 11-1 at 18). However, given the great breadth of the alleged trade-secret information Plaintiff accuses Defendants of stealing and using, the Court wonders whether the injunction Plaintiff seeks is—as a practical matter—truly so narrowly tailored. Plaintiff's proposed injunction asks the Court to require Defendants to "postpone[] and/or terminat[e] . . . any planned or pending acquisitions of RV parks in which [Plaintiff's] data and information [accessed and transferred from Plaintiff's CRM and/or JustCall account], directly or indirectly, played any role in identifying, sourcing, negotiating, or furthering." (Doc. No. 11 at 3-4). According to Plaintiff, this request leaves room for "Defendants to continue with their business, so long as they do not utilize [Plaintiff's] trade secrets in doing so." (Doc. No. 35 at 15). But because Plaintiff's alleged trade-secret information includes the Contact List, which includes over 34,000 RV parks, the injunction Plaintiff seeks would likely chill Defendants' willingness to pursue legitimately sourced properties out of fear that Plaintiff will accuse them of having misappropriated Plaintiff's Contact List (or other alleged trade-secret information) to secure a transaction. This chilling effect could very well harm Defendants' short-term and long-term financial success.

Moreover, even if the balance of equities did tip in Plaintiff's favor, that would not change the result, because Plaintiff has not satisfied any of the other requirements necessary to obtain preliminary injunctive relief. *See Sisters for Life*, 56 F.4th at 408-09.

## IV.    Public Interest

Finally, the Court must determine whether the injunction is in the public interest. *Winter*, 555 U.S. at 20. Plaintiff argues that the injunction would serve the public interest because it would

promote fair competition and protect confidential information from "further misappropriation and exploitation in accordance with the DTSA and [TUTSA]." (Doc. No. 11-1 at 19). It is true that the public interest is served by the protection of trade secrets. But for the reasons stated above, Plaintiff has not established (at least on the current record) even the existence of any trade secrets, much less misappropriation of those alleged trade secrets by Defendants. Therefore, the Court cannot conclude on this basis that the injunction would be in the public interest.

<u>CONCLUSION</u>

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). The use of the word "extraordinary" here, far from being merely rote, is quite apt; a preliminary injunction serves to treat a plaintiff (at least partially and temporarily) as if it has won the entire lawsuit when in fact it has not yet done any such thing, and this is indeed extraordinary. So although the Court does not take lightly the seriousness of the allegations made in Plaintiff's Verified Complaint, Plaintiff simply has not satisfied the heavy burden required to obtain such extraordinary relief.

Accordingly, Plaintiff's Motion (Doc. No. 11) will be denied.

An appropriate accompanying order will be entered.

IT IS SO ORDERED.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE